**Henry Samuel LIDE, III, Appellant,**

v.

**Deborah Ella LIDE, Appellee.**

**No. 08–01–00378–CV.**

Court of Appeals of Texas, El Paso.

June 26, 2003.

Roy L. Bell, Law Offices of Roy Bell, Odessa, for Appellant.

C.H. Hal Brockett, Jr., Brockett & Lindemood, Midland, for Appellee.

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

In this appeal from a final decree of divorce, Henry Samuel Lide, III challenges the appointment of Deborah Lide

as the sole managing conservator of the parties' four children. He also complains of the child support order which deviates from the statutory guidelines. We affirm.

## FACTUAL SUMMARY

Henry Lide and Deborah Bloxom were married in August 1981, separated in October 1999, and filed for divorce in July 2000. During the pendency of the divorce, the parties entered into an agreed temporary joint managing conservatorship of their four children, who resided with Deborah in the family home in Andrews. Henry relocated to Odessa, some twenty-five miles away. Pursuant to the temporary orders, Henry paid alimony *pendente lite* and child support of $5,000 per month.

Henry is a doctor of veterinary medicine and his private practice generated the bulk of the family income. The trial court found that his average monthly income for the years 1998 and 1999 was $7,333.64 and his monthly net resources for that period were $4,754.80. Henry does not challenge these findings on appeal. At the time of trial, Henry was practicing at the University Small Animal Clinic in Odessa. He believed the clinic had a fair market value of $450,000 and he had a pending sales contract at that price, which included the land, the building, the inventory, and a covenant not to compete. Although the contract had not been signed, Henry testified that he intended to accept it and that closing was scheduled within thirty days. Pursuant to the contract, Henry would receive a cash down payment of $250,000 and a promissory note in the amount of $200,000, payable over a ten year period.

During the marriage, Deborah was a homemaker. She received monthly oil royalties on inherited mineral interests which varied between $2,500 and $5,000 per month. She leased the surface for ranching and hunting for roughly $3000 per year. Deborah also trained and sold horses, maintaining her business on the twenty-five acres surrounding the family home. The business was not revenue producing and operated at a loss every year. But the horses were important to the children and rodeo events became a primary activity as they participated in barrel racing, roping and goat tying, ribbon roping, cow catching, and break away roping.

The record reveals that at some point, Deborah's mother and grandmother established custodial accounts to fund the children's college education. Both Henry and Deborah were signatories on the accounts. During the parties' separation, Deborah discovered that Henry had withdrawn some $80,000 from the accounts without her knowledge or permission. Henry testified that he spent the money to keep his business operating, to pay delinquent federal income taxes, and to pay for some of the activities in which the children were involved.

At trial, Deborah requested that she be appointed sole managing conservator and that Henry be ordered to pay $3,000 per month in child support. The trial court set child support at $2,500. This appeal follows.

## FAILURE TO FILE FINDINGS OF FACT AND CONCLUSIONS OF LAW

In Issue One, Henry complains that the trial court failed to make findings of fact and conclusions of law despite a timely request. TEX.FAM.CODE ANN. § 154.130(a)(3)(Vernon 2002). The trial court is required to make findings if the amount of child support awarded varies from the amount computed by application of the statutory guidelines. TEX.FAM.CODE ANN. § 154.130(a)(3). We abated the appeal and directed the trial court to make the necessary findings. The record has

been duly supplemented and the parties have had the opportunity to re-brief. Henry candidly concedes that the first issue is now moot. Accordingly, we overrule Issue One.

In Issues Two, Three, Four, and Five, Henry argues that there was legally or factually insufficient evidence to support Deborah's appointment as the sole managing conservator or to support the order of child support in excess of the presumptive guidelines. He also contends that the court's findings were so arbitrary and unreasonable as to constitute an abuse of discretion. In this case, as in most family law cases, these two standards of review overlap.

## STANDARDS OF REVIEW

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact-finding. *In the Interest of De La Pena,* 999 S.W.2d 521, 532 (Tex.App.-El Paso 1999, no pet.). When reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the trial court's finding, disregarding all contrary evidence and inferences. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001). "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. *Bates v. Tesar,* 81 S.W.3d 411, 425 (Tex.App.-El Paso 2002, no pet). The test for factual insufficiency is set forth in *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). In reviewing an issue asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact, as well as evidence which tends to disprove its existence. It is for the fact finder to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. *See Carrasco v. Goatcher,* 623 S.W.2d 769, 772 (Tex. App.-El Paso 1981, no writ).

Most orders arising from a suit affecting the parent/child relationship will not be disturbed on appeal unless the complaining party can demonstrate a clear abuse of discretion. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Hodson v. Keiser,* 81 S.W.3d 363, 367 (Tex.App.-El Paso 2002, no pet.). We engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion, and (2) did the trial court err in its application of discretion? *Hodson,* 81 S.W.3d at 367; *Lindsey v. Lindsey,* 965 S.W.2d 589, 592 (Tex.App.-El Paso 1998, no pet.). The traditional sufficiency inquiry applies to the first question. *Id.* Once we have determined whether sufficient evidence exists, we must then decide whether the trial court made a reasonable decision. In other words, we must conclude that the ruling was neither arbitrary nor unreasonable. *Hodson,* 81 S.W.3d at 367.

The term "abuse of discretion" is not susceptible to rigid definition. *Hodson,* 81 S.W.3d at 368; *Lindsey,* 965 S.W.2d at 591; *Landon v. Jean–Paul Budinger, Inc.,* 724 S.W.2d 931, 934 (Tex. App.-Austin 1987, no writ). The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles. *Hodson,* 81 S.W.3d at 368; *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986), *citing Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Com.App. 1939, opin-

ion adopted). Stated differently, the appropriate inquiry is whether the ruling was arbitrary or unreasonable. *Hodson,* 81 S.W.3d at 368; *Smithson v. Cessna Aircraft Company,* 665 S.W.2d 439, 443 (Tex. 1984); *Landry v. Travelers Insurance Co.,* 458 S.W.2d 649, 651 (Tex.1970). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965); *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (1959). An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *See In the Interest of Gonzalez,* 993 S.W.2d 147, 155 (Tex.App.-San Antonio 1999, no pet.); *D.R. v. J.A.R.,* 894 S.W.2d 91, 95 (Tex.App.-Fort Worth 1995, writ denied).

## SOLE MANAGING CONSERVATORSHIP

In Issues Two and Three, Henry claims the trial court abused its discretion in appointing Deborah as sole managing conservator of the children because (1) the evidence was factually and legally insufficient to support that order and (2) the evidence did not overcome the statutory presumption that joint managing conservatorship would be in the best interest of the children.

It is the public policy of this state to assure that children have frequent and continuing contact with parents who have shown the ability to act in their best interest, and to encourage parents to share in the rights and duties of raising their children after the parents have separated or dissolved their marriage. *See* TEX.FAM. CODE ANN. § 153.001; *Doncer v. Dicker-son,* 81 S.W.3d 349, 353 (Tex.App.-El Paso 2002, no pet.). The best interest of the child is always the primary consideration of the court in determining issues of conservatorship. *See* TEX.FAM.CODE ANN. § 153.002; *Doncer,* 81 S.W.3d at 353. There is a rebuttable presumption that the appointment of the parents as joint managing conservators is in the best interest of a child. TEX.FAM.CODE ANN. § 153.131(b). A rebuttable presumption "shift[s] the burden of producing evidence to the party against whom it operates." *In the Interest of Rodriguez,* 940 S.W.2d 265, 271 (Tex. App.-San Antonio 1997, writ denied), *citing General Motors Corp. v. Saenz,* 873 S.W.2d 353, 359 (Tex.1993). Once that burden is discharged and evidence contradicting the presumption has been offered, the presumption disappears and is not weighed or treated as evidence. *General Motors Corp.,* 873 S.W.2d at 359. The evidence is then evaluated as it would be in any other case, and the presumption has no effect on the burden of persuasion. *Id.* As Deborah requested that she be appointed sole managing conservator of the parties' four children, she had the burden to rebut the presumption. In determining whether she succeeded, we review the following factors:

• whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;

• the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest;

• whether each parent can encourage and accept a positive relationship between the child and the other parent;

• whether both parents participated in child rearing before the filing of the suit;

• the geographical proximity of the parents' residences;

- if the child is 12 years of age or older, the child's preference, if any, regarding the appointment of joint managing conservators; and

- any other relevant factor.

TEX.FAM.CODE ANN. § 153.134(a); *In re Marriage of Robinson,* 16 S.W.3d 451, 454–55 (Tex.App.-Waco 2000, no pet). We will begin with the trial court's specific findings of fact relating to managing conservatorship and then turn to an analysis of whether the evidence supports the findings.

### Findings of Fact

- Deborah Ella Lide and Henry Samuel Lide, III are the parents of Amy Lide, Aaron Lide, Lorissa Lide, and Katelyn Lide.

- Prior to trial, Amy Lide, Aaron Lide, Lorissa Lide, and Katelyn Lide filed a Choice of Managing Conservator by Child Ten years of Age or Older designating Deborah Lide as their managing conservator.

- Deborah Lide and Henry Lide were not able to cooperate with one another with respect to making decisions about the children.

- Henry Lide delayed signing permission and consent forms for the children's participation in extracurricular activities.

- Henry did not avail himself of all opportunities for visitation with the children during the pendency of this suit.

- Deborah and Henry were unable to cooperate with one another to arrange for pick up and delivery of the children for visitation purposes.

- Henry Lide withdrew the sum of approximately $80,000 from the children's college fund accounts that was established by the children's grandparents, without Deborah's permission.

- The appointment of Deborah Lide as the sole managing conservator of the children is in the best interest of the children.

### Benefits to the Child

Deborah offered no evidence that a joint managing conservatorship would have a negative impact upon the children, nor did she demonstrate that their needs would be benefitted if she were appointed the sole managing conservator. There was no testimony concerning the physical, psychological, or emotional needs of the children. Moreover, Deborah admitted on cross-examination that none of the children has any special needs.

### Shared Decision–Making Ability

Deborah testified that she had difficulty in obtaining Henry's signature on the children's permission slips for various activities. She explained that in order to participate in the state high school rodeo finals, the children needed the signatures of both parents since they were temporary joint managing conservators. As the deadline approached, Henry tried to exact favors in return for signing the paperwork, but the children never actually missed any events as a result of the delay. Deborah was also uncomfortable with Henry picking up and dropping off the children at her home because he tended to wander about the property. Because they were unable to cooperate with one another in arranging the children's visitation, the parties chose a mutually agreeable, neutral location to transfer possession.

### Ability to Encourage a Positive Relationship

Both parties evidenced their intent to comply with court-ordered visitation to ensure the children attended their extracurricular activities. As is frequently the case

in custody disputes, there is considerable finger-pointing reflected in the testimony. Henry did not avail himself of every visitation opportunity and he had never attended any his of oldest daughter's volleyball games. She had asked him to pick her up on one occasion at an interscholastic league event in Monahans, but Henry failed to show up. Henry claimed that he had missed some of his visits solely because of conflicting work schedules. Deborah admitted telling Henry that if he showed up at the children's rodeo events, she would leave and take the horses with her, thus preventing the children from participating. She would allow him to take the children to the rodeo events "[i]f it's his horses and tack."

### Child Rearing Participation

Henry acknowledged that Deborah was the children's primary care giver prior to the separation. There was no evidence that Henry had a poor relationship with his children or that he ever harmed or neglected them in any way. He attended their school and extracurricular activities when his work schedule permitted.

### Geographical Proximity

Upon the parties' separation, Henry moved to Odessa while the children remained with Deborah in Andrews. After the divorce was finalized, Henry moved to Midland, which is approximately 35 miles from Andrews. Henry argues that the distance is not so great that he would not be able to attend after-school activities, assist in choosing health care providers, or partake in the myriad of other daily decisions that must be made regarding the children. He contends that a joint managing conservatorship would clearly be feasible despite the geographic distance between the parties.

### Child's Age and Preference

Section 153.008 of the Texas Family Code now provides that a child who is twelve years of age or older may choose the managing conservator, by a writing filed with the court, subject to the approval of the court. *See* TEX.FAM.CODE ANN. § 153.008. At the time of trial and entry of judgment, the statute provided that a ten-year-old could elect the conservator; this provision encompassed all four of the Lide children, who ranged from ten to sixteen years of age. Each of the children filed an affidavit requesting that their mother be named as managing conservator. The oldest demonstrated some ambivalence—or pressure, perhaps—inasmuch as she executed four affidavits over a four month period. The first asked that her mother be named as managing conservator; the second designated her father. She re-designated her father in the third affidavit and finally reverted to choosing her mother.

### Other Relevant Factors

Deborah introduced evidence that Henry was serving a five-year probation under a deferred adjudication for the felony offense of oil field theft. The court also entered findings that Henry withdrew $80,000 from the children's college fund without Deborah's knowledge. Henry testified that he spent the money to keep his business operating, to pay delinquent federal income taxes, and to pay for some of the activities in which the children were involved. The tax deficiencies accrued as a result of the parties' failure to file tax returns for four years, which Deborah did not discover until she received a letter from the Internal Revenue Service in 1998. Upon investigation, Deborah learned that taxes had not been paid since 1994. She subsequently employed the services of a certified public accountant who by the time

of trial had prepared and filed the 1995, 1996, 1997, and 1998 returns. The parties incurred penalties of $13,000 as a result of late filing and late payment. Evidence of other financial irregularities was also presented. Henry admitted that a $100,000 certificate of deposit belonging to his father was posted as collateral on real estate indebtedness when the bank would not release the properties for sale. The collateral was seized by the bank and applied to the debt. He also claimed his mother had given him $20,000 to pay off heavy credit card debt.

### Analysis

■ There was no evidence of domestic violence in the household nor that the joint managing conservatorship imposed by the temporary orders had negatively impacted the health or emotional development of the children. While modification standards are not applicable where a temporary joint managing conservatorship is superceded by a sole managing conservatorship in the final decree of divorce, the behavior of both parents during separation is certainly relevant. Because Deborah was uncomfortable when Henry wandered about the property, transfers of possession could not be conducted at the children's residence. Henry delayed paperwork necessary for the children to participate in extracurricular activities in order to obtain visitation concessions. Deborah threatened to leave the children's rodeo events and take the horses with her if Henry showed up. All of this conduct demonstrates an inability of the parents to work together in the best interests of the children. Moreover, Henry's judgment and ability to make prudent decisions were called into question in light of his admission that he had raided the children's educational funds. Although he was willing to repay the $80,000 at the rate of $400 per month, it would take him 200 months—

more than sixteen years—to restore the monies. His oldest daughter was already sixteen years of age. Henry was relying on his father to see that each child had $20,000 available for college by the time of graduation from high school. As the trial court was in a superior position to determine the credibility and demeanor of the witnesses, it was justified in concluding that Henry had not acted in the children's best interest.

Sufficient evidence established that the parties could not share in decision making, nor could either promote a positive relationship between the children and the other parent. There was also evidence of fiscal mismanagement and poor judgment where the children were concerned. The trial court has wide latitude in determining the best interest of a child. Because the trial court did not abuse its discretion by appointing Deborah as sole managing conservator, we overrule Issues Two and Three.

## CHILD SUPPORT

■ In Issues Four and Five, Henry challenges the child support order because (1) the evidence was legally and factually insufficient to support the amount and (2) Deborah failed to overcome the statutory presumption that application of the child support guidelines was in the best interest of the children.

### The Statutes

The Family Code establishes guidelines for child support which are presumed to be reasonable and in the children's best interests. TEX.FAM.CODE ANN. § 154.122. The guidelines are specifically designed to apply to situations in which the obligor's monthly net resources are $6,000 or less. TEX.FAM.CODE ANN. § 154.125. Here, the percentage of net resources to be allocated

for the support of the four children is 35 percent. *Id.*

For purposes of our analysis, "net resources" includes all wage and salary income, self-employment income, and all other income actually being received, including capital gains. *See* TEX.FAM.CODE ANN. § 154.062(b). The court may order support above or below the guideline amount if the evidence rebuts the presumption that application of the guidelines is in the best interest of the children and justifies a variance from the guidelines. TEX.FAM.CODE ANN. § 154.123(a). In determining whether application of the guidelines would be unjust or inappropriate under the circumstances, the court shall consider evidence of all relevant factors, including:

- the ages and needs of the children;
- the ability of the parents to contribute to the support of the children;
- any financial resources available for the support of the children;
- the amount of time of possession of and access to the children;
- the amount of the obligee's net resources, including earning potential;
- child care expenses necessary to enable either party to maintain gainful employment;
- whether either party has the managing conservatorship or actual physical custody of another child;
- the amount of alimony or spousal maintenance actually and currently being paid or received by a party;
- expenses for a child for education beyond secondary school;
- whether the obligor or obligee has an automobile, housing, or other benefits furnished by an employer, another person, or a business entity;
- the amount of other deductions from wages, salary, or other compensation;
- provision for health care insurance and payment of uninsured medical expenses;
- special or extraordinary educational, health care, or other expenses of the parties or of the children;
- the cost of travel in order to exercise possession of and access to the children;
- positive or negative cash flow from any real and personal property and assets, including a business and investments;
- debts or debt service assumed by either party; and
- any other reason consistent with the best interest of the children, taking into consideration the circumstances of the parents.

*See* TEX.FAM.CODE ANN. § 154.123(b).

If the obligor's net resources exceed $6,000 per month, the court shall apply the percentage guidelines to the first $6,000. TEX.FAM.CODE ANN. § 154.126. The court may order additional amounts of child support as appropriate, depending on the income of the parties and the proven needs of the children. *Id.* The entire amount of the presumptive award must be subtracted from the proven total needs of the children. TEX.FAM.CODE ANN. § 154.126(b). The court must then allocate between the parties the responsibility to meet the children's additional needs, "according to the circumstances of the parties." *Id.* In no event may the obligor be required to pay more support than the greater of the presumptive amount or 100 percent of the proven needs of the children. *Id.* Ironically, the Family Code "provides a much narrower method for calculating the support obligation when an obligor's net monthly resources exceed $6,000...." *Scott v. Younts,* 926 S.W.2d 415, 419 (Tex. App.-Corpus Christi 1996, writ denied).

In other words, 'an obligor with less than $6,000 net monthly resources can be required to pay child support in ex-

cess of the child's proven needs, while an obligor with greater than $6,000 net monthly resources cannot.'

Janice L. Green, *Private School, Cars and Cell Phones: Strategies for Obtaining Support Outside the Guidelines, in* 3 STATE BAR OF TEXAS ADVANCED FAMILY LAW COURSE, Ch. 60, p. 2 (2001), *citing* K. Fuller and A. Wheat, *Child Support Guidelines: Going Over–the–Top and Staying There, in* STATE BAR OF TEXAS MARRIAGE DISSOLU- TION INSTITUTE M, M–3 (1997). Once again, we begin with the trial court's specific findings of fact.

### Findings of Fact

• From the tax returns introduced into evidence, the Court found that Henry made a profit from his veterinary prac- tice in the sum of $91,513,55 for 1995, $66,556.06 for1996, $50,081.66 for 1997 and $89,629.43 for 1998. Henry estimat- ed net profit from his veterinary prac- tice for the year 1999 was in the sum of $86,378.00 including depreciation and the sum of $88,700.00 excluding depreci- ation for a net monthly profit of $7,400.00 per month.

• Henry made an average monthly in- come for the years 1998 and 1999 in the sum of $7,333.64.

• The monthly net resources of Henry per month are $4,754.80.

• Henry intended to accept an offer to sell University Small Animal Clinic for the sum of $450,000.00 on the terms of $250,000.00 down payment and a promis- sory note in the sum of $200,00.00 pay- able over a term of ten (10) years.

• The amount of child support if the percentage guidelines are applied to the first $6,000.00 of the obligor's net re- sources is $1,664.18.

• The specific reasons for the amount of child support per month ordered by the court varies from $1,664.18 per month are:

(A) The ability of Henry to contribute to support of the children.

(B) Financial resources available to Henry, including the pending sale of the University Small Animal Clinic.

(C) The amount of time of possession with the children by Deborah.

(D) The extracurricular activities of the children including livestock activi- ties.

(E) The negative cash flow of Debo- rah in her horse training and sale business.

(F) The needs of the children in living at the residence in Andrews County, Texas amounts to the sum of $4,977.24.

• It is in the best interest of the children to set the child support obligation of Henry at the sum of $2,500 per month.

Henry does not complain of the trial court's finding that the net monthly re- sources from his veterinary practice total $4,754.80. Instead, he challenges the suffi- ciency of the evidence to support a child support award which exceeds the guide- lines. Although he addresses all of the factors articulated by the court in justify- ing an above-guideline award, he mostly focuses his attack on the needs of the children and the sale of his clinic. We shall do likewise.

### Needs of the Children

At issue is Petitioner's Exhibit # 5, a financial information sheet compiled by Deborah. We detail here her full testimo- ny on the financial needs of the children:

Q: Let me show you, if I could, what's been marked as Petitioner's Exhibit 5, ask you to look at Petitioner's Exhibit # 5 and tell me if you can identify what that is?

A: It's my Financial Statement.

Q: All right, and is it a financial information sheet that's been filled out in your hand writing?

A: Yes, sir, it is.

Q: Petitioner's Exhibit # 5 reflects the expenses that you incur for you and the children to live here at the property in Andrews County?

A: Yes, sir.

Q: And does it truly and accurately reflect the expenses that you have, some of which I know are averages, but on a normal month with respect to the children?

A: Yes, it does.

Q: And over on Page 1, you've reflected some income as royalties. What is that?

A: Those are oil royalties.

Q: Okay. Where did the oil royalties come from?

A: From the—and inheritance of the Big Lake and Upton County Ranch.

Q: Have you inherited certain mineral interest in which you're being paid royalty?

A: Yes, sir.

Q: All right. And you had put on here $3,000.00, is that an approximate sum per month that you're making off of royalties or would make off of royalties?

A: Yes, sir.

Q: All right. And based upon the expenses that you've listed and the debts that you had listed, did you come up with needing about $4,977.24 per month in order to live the normal lifestyle that you and the children do?

A: Yes, sir.

[Counsel for Deborah]: Your Honor, we would move for admission of Petitioner's 5.

[Counsel for Henry]: Your Honor, I don't have any objection to its admittance. This is the first time I've seen this, it's a different one that I'd been furnished earlier. I'd like a little time to go over it, Your Honor.

[Court]: Sure.

The exhibit was never re-offered and never admitted into evidence by the court. Consequently, it does not support the trial court's finding as to the proven needs of the children. However, our inquiry cannot stop here. Deborah testified concerning the dollar amount but her testimony failed to segregate the needs of the children from her own expenses. In response to questioning, Deborah explicitly acknowledged that the exhibit "reflects the expenses that you incur *for you and the children* to live here." [Emphasis added]. She later agreed that she needed "about $4,977.24 per month in order *to live the normal lifestyle that you and the children do.*" [Emphasis added]. Precedent establishes that Deborah's living expenses must be segregated from the proven needs of the children. *Nordstrom v. Nordstrom,* 965 S.W.2d 575, 579–80 (Tex.App.-Houston [1st Dist.] 1997, pet. denied), *cert. denied,* 525 U.S. 1142, 119 S.Ct. 1034, 143 L.Ed.2d 42 (1999); *Clark v. Jamison,* 874 S.W.2d 312, 316 (Tex.App.-Houston [14th Dist.] 1994, no writ); *In re Marriage of Edwards,* 804 S.W.2d 653, 656 (Tex.App.-Amarillo 1991, no writ). Because she never segregated, explained, nor itemized the particularized needs of the children, the evidence does not support the trial court's findings. Had the trial court determined that Henry's monthly net resources exceeded $6,000, we would be required to reverse; support in excess of the guidelines must be predicated upon the proven needs of the children when net resources exceed the $6,000 cap. But because the court below calculated Henry's net resources at $4,754.80, we must review the

evidence relating to other factors proper for consideration.

### Sale of the Clinic

As we detailed in the factual summary, Henry intended to close on a pending sale of his veterinary practice within thirty days of trial. Pursuant to the terms of the contract, he would receive $250,000 in cash and a ten-year payout of a $200,000 promissory note. The business carried some indebtedness but the parties disagreed on the amount. Henry claimed debts of $412,000, including $150,000 which he purportedly owed to his parents, generating a net value of $38,000. Because no promissory notes secured the debts to Henry's parents, Deborah disputed the necessity of repayment. Neither party offered evidence as to the tax basis of the business.

Henry argues that the sales contract could not be considered for purposes of child support for two reasons. First, he contends that because the proposed sale was not yet complete, he was not actually receiving the stream of income as required by Section 154.062(b)(5)(net resources include all other income *actually being received*). TEX.FAM.CODE ANN. § 154.062(b)(5). Second, he argues that proceeds of the sale would constitute "return of principal or capital" or "accounts receivable," both of which are expressly excluded from the definition of "net resources." TEX.FAM.CODE ANN. § 154.062(c). These arguments would have some merit if the trial court had included the proceeds of the sale in the calculation of net resources. Instead, as the findings of fact clearly show, the court found net resources of $4,754.80; it then articulated several reasons for exceeding the guidelines, one being "[f]inancial resources available to [Henry], including the pending sale of the University Small Animal Clinic."

As we have noted, the Family Code mandates that in determining whether application of the guidelines would be unjust or inappropriate, the court *shall* consider "any financial resources available for the support of the child." TEX.FAM.CODE ANN. § 154.123(b)(3). We have found no case law which defines "financial resources" but a clear reading of the statute indicates it is not synonymous with "net resources." Indeed, a different subsection specifically uses the phrase "net resources" when directing the court to consider the obligee's income. TEX.FAM.CODE ANN. § 154.123(b)(5). Moreover, Henry did not object when the contract was admitted into evidence, nor did he request that it be admitted for the limited purpose of establishing fair market value of the business necessary for a division of the marital estate. While the record does not reveal whether the sale actually closed, we do know that at the hearing on the motion for new trial some four months after the bench trial, Deborah's counsel argued that the court could properly consider the sale in setting child support. Henry did not object, nor did he ask to re-open the evidence as one might expect him to do if the sale had not materialized. *See Eldred v. Eldred*, No. 03–98–00167–CV, 1999 WL 190398 (Tex.App.-Austin, April 8, 1999, no pet.)(not designated for publication), 1999 WL 190398, at *7. We therefore conclude that the evidence supports the trial court's findings that a variation from the guidelines was justified. Finding no abuse of discretion, we overrule Issues Four and Five. The judgment of the trial court is affirmed.